COMMONWEALTH *vs.* ROBERT BLANCHETTE.

No. 01-P-774.

Suffolk. October 16, 2001. - March 8, 2002.

Present: LENK, COWIN, & McHUGH, JJ.

*Sex Offender. Practice, Civil,* Sex offender. *Constitutional Law,* Sex offender. *Due Process of Law,* Sex offender. *Evidence,* Sex offender, Expert opinion. *Probable Cause.*

Discussion of the "directed verdict" standard for a determination in an evidentiary hearing pursuant to G. L. c. 123A, § 12(*c*), that the Commonwealth has shown probable cause to believe that a person is a sexually dangerous person. [172-175]

In view of certain evidentiary deficiencies and the judge's possible application to the evidence of a more rigorous qualitative standard than was appropriate following an evidentiary hearing pursuant to G. L. c. 123A, § 12(*c*), resulting in a determination that the Commonwealth had not shown probable cause to believe that a certain person was a sexually dangerous person, and given the fact that the § 12(*c*) hearing at issue was conducted prior to the Supreme Judicial Court's decision in *Commonwealth* v. *Bruno,* 432 Mass. 489 (2000), which clarified many unsettled issues, including the burden of proof to be borne by the Commonwealth in a § 12(*c*) hearing, this court vacated the judgment of dismissal and remanded the case to the judge for an expeditious reevaluation of the evidence and such further proceedings as appropriate. [175-179]

PETITION for civil commitment filed in the Superior Court Department on April 25, 2000.

Following a hearing on the issue of probable cause to classify the defendant as sexually dangerous, a motion to dismiss was heard by *Nonnie S. Burnes,* J.

*Kajal K. Chattopadhyay,* Assistant District Attorney, for the Commonwealth.

*Deborah A. Beard* for the defendant.

LENK, J. Following an evidentiary hearing pursuant to G. L. c. 123A, § 12(*c*), a Superior Court judge determined that the Commonwealth had not shown probable cause to believe that

Robert Blanchette is a sexually dangerous person as defined in G. L. c. 123A, § 1. The Commonwealth contends on appeal that the judge misapplied the pertinent standard for determining probable cause, erroneously rejecting in the process certain evidence presented by the Commonwealth.

The timing of the probable cause hearing in question compounds the difficulty of the issue presented. The hearing took place on May 2, 2000, after the effective date of St. 1999, c. 74, §§ 3-8, which amended G. L. c. 123A, but before the decision in *Commonwealth* v. *Bruno,* 432 Mass. 489 (2000), which clarified many residual unsettled issues. Among those unsettled issues was the burden of proof that the Commonwealth must bear at a § 12(*c*) probable cause hearing.[1] Accordingly, at Blanchette's probable cause hearing, the Commonwealth expressly proceeded on a "probable cause to arrest" standard, a less onerous burden of proof that *Bruno* later rejected in favor of a so-called "directed verdict" standard. See *Bruno, supra* at 510. In reaching her decision, however, the judge indicated her reliance upon a standard of proof derived from the reasoning in a decision of another Superior Court judge, a standard which in large measure presaged the standard later articulated in *Bruno.*

Notwithstanding the position it took at the hearing,[2] the Commonwealth now contends that the judge in essence used the correct standard but misapplied it by evaluating and, in instances, rejecting the Commonwealth's evidence. We are called upon in

---

[1]Another unsettled issue, one to which the judge devoted a substantial part of her written rulings of law, was whether the statute was retroactively applicable to those, like Blanchette, whose convictions predated its enactment. The judge decided that the statute had no application to Blanchette, a ruling which proved to be at odds with the later holding in *Commonwealth* v. *Bruno,* 432 Mass. 489, 497-499 (2000).

[2]At the hearing, the Commonwealth argued that "the probable cause hearing is not to determine whether this person has a mental abnormality or personality disorder. We are here to determine whether he should be committed to the Massachusetts Treatment Center for sixty days to have two qualified examiners examine him and evaluate him and provide the court with that information. The standard of probable cause to arrest here, not a required finding standard, fits this purpose. And with the testimony that you've heard today from Dr. Tomich, who has just reviewed the records and not had an opportunity to speak with the defendant, I would suggest it would be illogical to come to the determination that this person has a mental abnormality or personality disorder."

this case to explore the meaning of the *Bruno* "directed verdict" standard and to address the scope of the judge's role in making the requisite determination under § 12(*c*), "whether probable cause exists to believe that the person named in the petition is a sexually dangerous person."[3] G. L. c. 123A, § 12(*c*).

*Procedural background.* At the end of April, 2000, Blanchette had completed nearly sixteen years in prison for serious sexual offenses he had committed against four female children in 1979 and 1982. Days before his release, the Commonwealth filed a petition for temporary commitment under G. L. c. 123A, § 12(*b*). After a hearing, Blanchette was ordered temporarily committed to the Treatment Center at Bridgewater pursuant to G. L. c. 123A, § 12(*e*), pending a probable cause hearing. On May 2, 2000, the judge heard both Blanchette's motion to dismiss and the § 12(*c*) probable cause issue. On June 9, 2000, the judge concluded, as relevant here, that probable cause did not exist to believe that Blanchette is a sexually dangerous person. She then vacated her prior order holding him at the Treatment Center, and briefly stayed that order to permit an emergency appeal to a single justice of this court. The single justice then stayed Blanchette's release pending appeal, and he remains to date in the Treatment Center.[4]

*The probable cause hearing.* The only witness to testify was

---

[3]Blanchette maintains that the Commonwealth may not appeal from the judge's determination that no probable cause exists to believe he is a sexually dangerous person, basing this contention on the absence of any statutory provision expressly conferring such a right of appeal. Because we think that *Wyatt, petitioner,* 428 Mass. 347, 351 (1998), and *Hill, petitioner,* 422 Mass. 147, 151, 155, cert. denied, 519 U.S. 867 (1996), foreclose any serious contention that the Commonwealth cannot appeal, we do not further address the point other than to observe that the current incarnation of G. L. c. 123A was enacted after *Wyatt* and *Hill* and did not revoke or limit *Wyatt*'s broad holding that "[t]he Commonwealth may appeal any ruling or judgment adverse to it in a c. 123A proceeding." See *Wyatt, supra* at 351.

[4]Blanchette understandably protests his prolonged detention in the Treatment Center following the wrap-up of his prison sentence, given the judge's determination that no probable cause exists to believe him a sexually dangerous person. That it has taken so long to address and resolve the legitimate questions raised on appeal concerning a matter of such gravity is without question lamentable. The unique circumstances provide some explanation: Blanchette was an early candidate for inclusion under a recently enacted statutory scheme attempting to deal with a seemingly intractable problem of immense social importance that left many difficult issues unsettled. He stood

the Commonwealth's expert, Dr. Niklos Tomich, an experienced forensic psychologist who, as a "qualified examiner," had previously performed a number of evaluations for sexual dangerousness. In addition, there were eight exhibits, not all of which are before us.[5] It is not clear from the hearing transcript precisely which of these documents the expert reviewed[6] in making his evaluation of Blanchette, but it is clear that Tomich

convicted of heinous crimes against children and was not subject to supervised probation upon his release from incarceration. The Superior Court judge thought a sufficient showing had been made to warrant his temporary commitment under § 12(e) pending disposition of the probable cause determination. A single justice of this court thought a stay pending appeal was warranted given Blanchette's risk of flight and the substantiality of the Commonwealth's appellate issues. Blanchette sought further review pursuant to G. L. c. 211, § 3, which was denied without a hearing. The period of time on appeal preceding oral argument is attributable chiefly to the many months it took for the transcript to be prepared and to the concommitant delay in the preparation of the Commonwealth's brief. That the foregoing may explain the defendant's prolonged detention does not justify its occurrence and only underscores the need to prevent its recurrence. See generally *Commonwealth* v. *Kennedy*, 435 Mass. 527, 531 (2001) ("Where, as here, the G. L. c. 123A proceedings are still ongoing and the defendant is detained beyond his discharge date, the liberty interests at stake compel strict adherence to the time frames set forth in the statute"). While the Commonwealth has the right to appeal from adverse rulings in c. 123A proceedings, see note 3, *supra*, in instances involving detention beyond the discharge date, we think that, in view of *Kennedy*, it must henceforth obtain necessary transcripts and in all other respects prosecute the appeal in an expeditious fashion or risk dismissal of the appeal. Additionally, pending such appeals (and, in this case, during the pendency of the proceedings on remand), consideration should be given by the trial court judge in appropriate cases to devising and imposing conditions of supervised probation in lieu of detention in the Treatment Center.

[5]The exhibits are described in the transcript as follows: Exhibit 1 — six-part Department of Correction folder for Blanchette; Exhibit 2 — Boston police reports; Exhibit 3 — Department of Social Services report; Exhibit 4 — Motion for commitment; Exhibit 5 — Institutional adjustment and case summary; Exhibit 6 — Report of qualified examiner to the court for examinations of Blanchette done on March 22 and April 2, 1987; Exhibit 7 — Certified copies of Blanchette's convictions; Exhibit 8 — Department of Correction disciplinary reports. The materials in the Commonwealth's record appendix are not compiled in a manner permitting us easily to ascertain which document(s) correspond to which exhibit number. Further, Exhibit 6 seems to be missing entirely.

[6]Tomich testified that he "reviewed the entire record that I think you entered into evidence as DOC's six-part folder. Contained within that are pretrial probation reports, police reports, grand jury minutes, and Mr. Blanchette's institutional adjustment throughout the years he's been

based his opinion solely upon his six-hour long "total review" of that record since, prior to his testimony, he had not spoken with Blanchette.

On direct examination, Tomich opined that Blanchette fit the definition of a sexually dangerous person under G. L. c. 123A, § 1, in that he suffers from a mental abnormality or personality disorder that makes him likely to engage in future sexual offenses if not confined to a secure facility. He based this opinion upon his review of the records insofar as they addressed Blanchette's criminal offenses, personal history, and incarceration history.

Blanchette's mental abnormality, the expert said, is pedophilia. His personality disorder is that of antisocial personality disorder. Tomich testified that, based on the nature of the 1979 and 1982 criminal sexual offenses, Blanchette exhibits symptoms of pedophilia, as indicated by the number of Blanchette's victims (four), their ages (9-14 years old), that they were known to him, that two were of diminished capacity (both had cerebral palsy and one was blind), the number of sexual offenses (vaginal, digital and anal rapes) and their aggressive and sadistic nature (binding, threatening, using force on several victims, including a knife), and that he took pornographic pictures of at least one of the four girls. Blanchette's antisocial personality disorder is, in Tomich's view, evidenced by the aforesaid repetitive sexual offenses and by Blanchette's aggressive behavior while in prison as set forth in the Department of Correction disciplinary reports.

The expert also based his opinion of "sexual dangerousness" upon Blanchette's personal history (which indicated that he was raised in orphanages until age ten or eleven, was physically abused by his stepmother, and was beaten and threatened with knives — the latter behavior being replicated in some of Blanchette's later sexual offenses), that Blanchette had attempted suicide on several occasions, that he had a record of disciplinary problems while in prison, some for aggressive

---

incarcerated." He later testified that he had not reviewed the Department of Social Services record, presumably Exhibit 3.

behavior, and that, while incarcerated, Blanchette had refused to undergo sex offender treatment.

On cross-examination, the expert was examined closely on the meaning of the term "antisocial personality disorder." He indicated that it is a lack of regard for social norms evidenced since adolescence, a disregard for the safety of himself and others, aggressiveness, impulsivity, and a pattern of criminal behavior. When queried as to whether the disorder had evidenced itself in Blanchette since adolescence, Tomich acknowledged that no reference to such a disorder appeared in the report of the two examinations done of Blanchette in 1987 by a qualified examiner. As to impulsivity, Tomich saw it evidenced in several suicide attempts during the 1980's as well as in two instances of misconduct for which he received disciplinary reports, namely (a) a 1986 incident in which Blanchette got into a verbal altercation with a correction officer, after which he made a disrespectful gesture and remark to the officer; and (b) a 1995 incident where Blanchette used a pool cue to break some screens, for which he was fined fifty dollars. With regard to the asserted pattern of criminal conduct, Tomich acknowledged that Blanchette's criminal record consisted only of the four sex crimes for which he had been incarcerated — his sentence having begun when he was about forty years old — and a motor vehicle offense for which he had served three months in prison. The expert noted that Blanchette sought individual therapy between 1982 and 1984 for possible sexually abusive behavior but declined to undergo sex offender treatment while incarcerated.

*The judge's findings and rulings.* The judge recited facts underlying the 1984 indictments for which Blanchette was incarcerated that she took from her independent review of the police reports in evidence. She also summarized the expert's testimony, and, after herself reviewing the records in evidence that the expert had relied upon, noted that certain records did not bear out aspects of the expert's testimony. In that regard, the judge found that the Department of Correction records did not reflect a significant disciplinary record and that there was

only one documented suicide attempt by Blanchette at the beginning of his incarceration, not four such attempts.[7]

The judge ruled that the Commonwealth had not satisfied its burden of presenting enough evidence to establish probable cause to believe that Blanchette remains sexually dangerous, i.e., it had not presented "sufficient evidence for a reasonable jury to find, beyond a reasonable doubt, the predicate facts to establish sexual dangerousness: specifically, that Blanchette has a 'mental abnormality' or a 'personality disorder,' as those terms are defined in the statute, making him 'likely' to engage in sexual offenses if not confined."

The judge noted that the Commonwealth's expert had testified "summarily" as to Blanchette's mental abnormality and personality disorder, observing that

> "[t]here is scant evidence to support this opinion, other than the fact of the convictions themselves . . . . [T]he Commonwealth provides insufficient evidence of the alleged acts which form the crucial support for their conclusion that Blanchette qualifies as an SDP. They conflate the statutory standard of probable cause by merely stating that because Blanchette committed sexually aggressive crimes, he should qualify as an SDP. . . . Acknowledging that 'pedophilia symptoms' can be unassessable while in prison, the Court . . . can find no evidence of severe assaultive behavior, outward sexual misbehavior, or obsessive or compulsive behavior by Blanchette while imprisoned. Five disciplinary reports over 15 years is an exemplary behavior

---

[7]The record reflects six disciplinary reports in Blanchette's fifteen years of incarceration, one of which was later dismissed. In 1986, Blanchette received a disciplinary report for insolent remarks and gestures he made toward a correctional officer; in 1989, the report — later dismissed — concerned use of a bent toothbrush to interfere with a locking device; in 1990, the report was for possession of unauthorized items, viz., a container of paint, two large plastic buckets, a television antenna, an extension cord, an electric Christmas candle, a pillow, and two extra blankets; in 1995, the report described Blanchette as having damaged with a pool cue five window screens that were stacked against a wall; in early 2000, the report was for Blanchette's being in possession of an unauthorized cane. As to the suicide attempt, it appears that the records reflect four suicide attempts, all in the early to mid-1980's; their significance in assessing Blanchette's current mental condition was not explained other than as indicative of impulsivity.

record in prison. Blanchette's records indicate no mental health problems."

*The Commonwealth's position.* On appeal the Commonwealth urges the view that the judge misunderstood and misapplied the *Bruno* "directed verdict" standard for § 12(c) determinations of probable cause. It maintains that it presented ample evidence to support its expert's conclusion that Blanchette fit the statutory definition of a sexually dangerous person. It argues in this regard that the judge misapprehended the quantum of evidence necessary to satisfy the directed verdict standard and misapplied the standard (a) in failing to view the evidence in the light most favorable to the Commonwealth, instead evaluating and disputing the expert's testimony and the grounds for it, and (b) in discrediting the expert's testimony such that the judge mistakenly concluded that Tomich's opinion was based exclusively on Blanchette's prior criminal acts of sexual misconduct when it was in fact based on other factors as well.

*The § 12(c) "directed verdict" standard.* In *Bruno*, the Supreme Judicial Court provided an overview and clarification of the statute, as amended in 1999. It noted that the focus of the statutory definition of "sexually dangerous person" and of the statute's various procedural sections governing commitment is a defendant's "current mental condition." *Bruno, supra* at 498. Because of the potential deprivation of liberty to those persons subjected to civil commitment proceedings under the statute, due process protections must apply to such proceedings, notwithstanding the civil nature of G. L. c. 123A. See *id.* at 507-510.

While the § 12(c) probable cause hearing is a preliminary hearing, due process considerations caused the court to reject the Commonwealth's contention that it need only be held to a "probable cause to arrest" standard of proof, as in a preliminary parole revocation hearing or in a grand jury proceeding. See *Bruno, supra* at 509-510. Because § 12(c) calls for an "adversary proceeding conducted in a formal manner before a judge in the Superior Court, not unlike a trial," *id.* at 509, involving the right to counsel, the right to confront and cross-examine witnesses, and the right to call witnesses, and because its goal is to determine whether to hold a defendant for further

proceedings, the court viewed the § 12(*c*) hearing as being more analogous to a District Court bind-over hearing held pursuant to G. L. c. 276, § 38. See *id.* at 510. In such a bind-over hearing, the Commonwealth's burden of proof is the "directed verdict" standard referred to and explained in *Myers* v. *Commonwealth*, 363 Mass. 843, 850 (1973).

The primary function of the District Court bind-over hearing is to screen out at an early but critical stage those cases that should not go to trial, thereby sparing individuals from being held and unjustifiably prosecuted. See *Myers*, 363 Mass. at 847. The judge's chief task is to "determine whether there is sufficient credible evidence which justifies binding the defendant over," *Myers*, *supra*, and this determination "is somewhat analogous in function to the trial court's ruling on a motion for a directed verdict as to whether there is sufficient evidence to send the case to the jury." *Ibid.* The judge should "view the case as if it were a trial and he were required to rule on whether there is enough credible evidence to send the case to the jury." *Id.* at 850. "The minimum quantum of evidence . . . is more than that for probable cause to arrest but less than would 'prove . . . guilt beyond a reasonable doubt' " (citations omitted). *Ibid.*

The centrality of the screening function, moreover, "can only be effectuated by an adversary hearing where the defendant is given a meaningful opportunity to challenge the credibility of the prosecution's witnesses and to raise any affirmative defenses he may have." *Id.* at 852. What this unavoidably entails for the hearing judge is that she make some assessment of the credibility of the evidence that is presented when making the determination as to whether sufficient evidence has been presented to warrant further proceedings.[8] This is an exercise requiring a very deft touch and considerable restraint on the

---

[8]The "directed verdict" standard of *Myers* v. *Commonwealth*, 363 Mass. 843, 850 (1973), requires some assessment of credibility, while credibility generally plays no role in the analogous, but not identical, directed verdict decision at trial, where evidence is to be viewed in the light most favorable to the non-moving party. See *Commonwealth* v. *Baron*, 356 Mass. 362, 365-366 (1969), cited in *Myers*, *supra* at 850. Accord, e.g., *Bonin* v. *Chestnut Hill Towers Realty Corp.*, 392 Mass. 58, 71 (1984); *Olson* v. *Charland*, 20 Mass. App. Ct. 954, 955 (1985); *Sahagan* v. *Commonwealth*, 25 Mass. App. Ct. 953 (1988). See Liacos, Massachusetts Evidence § 5.2.1 (7th ed. 1999). See also LaFave, Criminal Procedure § 14.3 (1999 & Supp. 2002); Landis, Propriety

part of the judge. The proceeding is a preliminary one, and the evidence, of necessity, is often quite hastily cobbled together; to expect a trial-quality presentation would be unrealistic and contrary to the role which the hearing plays in the over-all scheme. The preliminary nature of the hearing — to be followed in many instances by trial, in the case of a bind-over hearing, and by a sixty-day commitment for evaluation and then possible trial, in the case of a c. 123A, § 12(*c*), probable cause hearing — dictates that ultimate credibility determinations are ordinarily to be reserved for a subsequent trier of fact.

> "[T]he judicial role in pretrial screening involves weighing and judgment rather than a wooden comparison of the testimony with the elements of the crime. Although credibility ordinarily is a matter for the jury, and it is not expected that judges will normally resolve testimonial conflicts at the preliminary hearing, cases do occasionally arise in which a witness's testimony is so weak or contradicted by sufficiently clear facts that the judge should have the power to dismiss the case."

*Myers* v. *Commonwealth*, 363 Mass. at 853 n.12, quoting from A Model Code of Pre-Arraignment Procedure (T.D. No. 5) at 91 (Model Code). At the same time, the judge's role remains considerably greater at such a hearing than that of the proverbial potted plant: to make the requisite determination, the judge must be permitted to consider "the credibility of the witnesses and the quality of the evidence introduced." *Myers, supra* at 853, quoting Model Code, § 330.5(3).[9]

Taking into account the preliminary nature of the § 12(*c*)

of Consideration of Credibility of Witness in Determining Probable Cause at State Preliminary Hearing, 84 A.L.R.3d 811 (1978 & Supp. 2001). The court's use of the "directed verdict" label in *Bruno* and *Myers* to identify the decision-making process it envisions in each instance holds some potential for confusion in this regard. The label does no more than describe an analogue; it does not fully articulate the process.

[9]It is to be noted in this regard that expert witnesses are not immune from such judicial scrutiny. It is telling that the court in *Bruno* observed that the c. 123A, § 12(*c*), probable cause hearing judge had heard testimony from two experts and that "[t]he judge credited their testimony." *Bruno, supra* at 513. The necessary corollary is that the judge was equally free not to have credited their testimony in whole or in part. This is entirely in keeping with well established precedent holding that the law does not give the opinions of

probable cause hearing, the screening function that the hearing performs, the substantial public safety and liberty interests that are at stake, and the need to consider not only the Commonwealth's evidence but also the cross-examination of witnesses by the defendant and any evidence he may introduce, we are of the opinion that implementation of the "directed verdict" decision-making process requires a two-part inquiry, one part of which is quantitative and the other qualitative. The judge must be satisfied, first, that the Commonwealth's admissible evidence,[10] if believed, satisfied all of the elements of proof necessary to prove the Commonwealth's case. Second, she must be satisfied that the evidence on each of the elements is not so incredible, insubstantial, or otherwise of such a quality that no reasonable person could rely on it to conclude that the Commonwealth had met its burden of proof. The second part of the inquiry, of necessity, involves, inter alia, an assessment of credibility. In conducting this credibility assessment, the judge is not to look to whether she is herself persuaded by the evidence. Instead, the judge is to determine whether the evidence before her is of suitable quality to allow the action to proceed further along a course that was legislatively designed ultimately to place the matter before a trier of fact.

*Analysis.* Given the statutory scheme, the § 12(*c*) probable cause hearing, much like the District Court bind-over hearing — its functional and procedural analogue, but not its twin — has as its central function the screening out of meritless petitions brought by district attorneys under § 12(*b*). The district attorneys make their determinations of what petitions to bring — of selecting which persons convicted of statutorily enumerated sexual crimes are sexually dangerous and thus likely recidivists — without the benefit of explicit statutory guidelines. Given available statistics about the relationship between pedo-

experts, even if uncontradicted, the benefit of conclusiveness. See *Commonwealth* v. *Lamb*, 372 Mass. 17, 24 (1977); *Commonwealth* v. *DeMinico*, 408 Mass. 230, 235 (1990); *Commonwealth* v. *Rosenberg*, 410 Mass. 347, 357-358 (1991).

[10]No question has been raised as to the admissibility of Dr. Tomich's testimony. Accordingly, we need not address considerations pertinent to determining the admissibility of expert testimony in the context of § 12(*c*) probable cause hearings.

philia and recidivism, persons who have committed sexual crimes against youngsters and who are regarded as potential pedophiles are doubtless often likely candidates for such petitions.[11] The challenge presented to judges is to screen out those petitions that, while meeting some eligibility criteria such as conviction of certain prior sex crimes, do not meet other statutory criteria. Section 1 of the statute identifies those elusive criteria.

As relevant here, a "sexually dangerous person" includes one who has been "convicted of . . . a sexual offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in sexual offenses if not confined to a secure facility." G. L. c. 123A, § 1. A "mental abnormality" in turn is defined as "a congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons." *Ibid.* A "personality disorder" is defined as "a congenital or acquired physical or mental condition that results in a general lack of power to control sexual impulses." *Ibid.* See *Kansas* v. *Crane*, 534 U.S. 407 (2002).

In the hearing at issue, the judge was required to determine if probable cause existed to believe that Blanchette is a sexually dangerous person. The two-part inquiry, discussed above, required that she determine whether (a) the Commonwealth's evidence, if believed, satisfied all the elements it was required to prove in order to demonstrate that Blanchette was then sexually dangerous; and (b) the evidence satisfying those elements was not so incredible, insubstantial, or otherwise of such a quality that no reasonable person could rely on it to conclude that the Commonwealth had proven Blanchette then sexually dangerous.

---

[11]See, e.g., Keating and Messenger, Chapter 74: Massachusetts' New Sex Offender Law, 44 Boston B.J. 10 & n.1 (May/June, 2000), citing Mehta, Shrink Rap: Treating Sex Offenders Becomes an Industry, But Does It Work?, Wall St. J., May 24, 1996, at A1; Isaac, *Kansas* v. *Hendricks*: A Perilous Step Forward in the Fight Against Child Molestation, 35 Hous. L. Rev. 1295, 1296 (1998). See also Peters-Baker, Challenging Traditional Notions of Managing Sex Offenders: Prognosis is Lifetime Management, 66 U.M.K.C. L. Rev. 629 (1998).

The Commonwealth provided the judge with evidence that it thought at the time sufficient to meet a lower burden of proof than *Bruno* later decreed necessary for § 12(*c*) probable cause hearings. The judge was not unwarranted in thinking the evidence before her scant. It was for the Commonwealth to prove affirmatively that Blanchette had the requisite current mental condition(s) which, as a "predictive behavioral question," make it likely that Blanchette will reoffend. *Bruno, supra* at 510-511. The expert stated, to be sure, that Blanchette suffers from a mental abnormality (pedophilia) and from a personality disorder (antisocial personality disorder) and was likely to reoffend if not in a secure facility. The Commonwealth's expert touched the formulaic statutory bases in his testimony and alluded to the data upon which he relied in forming his opinions, but the judge was not, as the Commonwealth would have it, limited to a "wooden comparison" of his testimony with the statutory elements. Her role included the "weighing and judgment" that *Myers* alluded to, and that we have described as a qualitative assessment of the evidence. She received precious little assistance in this task.

On direct examination, for example, the expert was neither asked to nor did he articulate the accepted diagnostic criteria for pedophilia and antisocial personality disorder, explain how the data upon which he relied satisfied some or all of the diagnostic criteria, discuss in what respect Blanchette's pedophilia was a condition meeting the statutory criteria for "mental abnormality" (including how it would create a predisposition to the commission of criminal acts), or in what way Blanchette's antisocial personality disorder was a "personality disorder" as defined in the statute (including how it might result in a general lack of power to control sexual impulses). The expert made no attempt to explain the clinical basis for linking Blanchette's past history and conduct, sexual and otherwise, with present or future behavior so as to produce the diagnosis of a currently sexually dangerous person. Otherwise put, the expert did not do much to explain his opinion on a reasoned basis that would allow evaluation of that opinion on its merits.

The expert was, moreover, subjected to cross-examination which arguably revealed certain vulnerabilities in the personal-

ity disorder prong of his opinion. There is also the matter of the expert's reliance upon certain records, notably prison disciplinary reports, for aspects of his opinion, the reasonableness of which the judge questioned given her own evaluation of those records. Although the Commonwealth suggests that the judge improperly "substituted" her own opinion for the expert's as to what the records signify, we think it entirely appropriate for the judge to have assessed the weight and over-all reliability and credibility of the expert's opinion by measuring it against matters already known to her. A Superior Court judge sees prison disciplinary reports as a matter of course in her job, and this experienced judge was surely in a position to make an informed assessment of the reports as to Blanchette. That her assessment differed from that of the Commonwealth's expert could properly factor into her determination of how credible that expert's testimony was and how much qualitative heft it could be accorded, just as the fact that the expert had never examined Blanchette could properly be part of such a calculus.

Nonetheless, the judge never expressly indicated that she did not credit the expert's conclusion. The Commonwealth's point is also well taken that the judge appears to have reduced the grounds for the expert's opinion only to Blanchette's prior sex crimes, ignoring in the process other factors which he considered when forming his opinion, such as Blanchette's personal history and Blanchette's decision, while incarcerated, to decline sexual offender treatment. As to the latter, the Supreme Judicial Court cogently observed in *In re Hill*, 422 Mass. 147, 157 (1996), that

> "[e]xamples of recent conduct showing sexual dangerousness may often be lacking where the individual's dangerous disposition is of a sort that there will be no occasion for that disposition to manifest itself in a secure environment. And it cannot be the case that an individual's refusal to submit to examination or to participate in treatment, in which his current dispositions might manifest themselves, will more or less automatically guarantee himself a favorable determination."

The Commonwealth is also correct in observing that the judge's

findings do not take into account the remaining exhibits in evidence. Finally, and perhaps most importantly, it appears from the judge's findings that she proceeded on the premise that she was required to determine whether she herself was persuaded by the Commonwealth's evidence, rather than, as we have discussed, whether that evidence was qualitatively of such a character that no reasonable person could rely on it to conclude that the Commonwealth had demonstrated probable cause that Blanchette was then sexually dangerous. In so doing, she may well have applied to the evidence a more rigorous qualitative standard than is appropriate.

In view of these deficiencies and given the pre-*Bruno* timing of the § 12(*c*) hearing at issue, with its concomitant uncertainty as to the applicable burden of proof, we think the interests of justice will best be served by vacating the judgment of dismissal and remanding the case to the judge for an expeditious reevaluation of the evidence and such further proceedings consistent with this opinion as she may deem appropriate. The stay of Blanchette's release is continued pending the judge's further consideration of the matter.

*So ordered.*