# DECISIONS

OF THE

## APPEALS COURT

OF

## MASSACHUSETTS

---

COMMONWEALTH *vs.* DAVID HUSBAND.

No. 10-P-1857.

Middlesex. November 9, 2011. - June 18, 2012.

Present: GREEN, SIKORA, & WOLOHOJIAN, JJ.

*Sex Offender. Evidence,* Sex offender, Expert opinion.

In proceedings arising from the Commonwealth's petition for the defendant's commitment as a sexually dangerous person, the available expert testimony furnished proof beyond a reasonable doubt for the judge's ultimate finding that the defendant had a longstanding antisocial personality disorder that, although eluding specification, made it likely that the defendant would re-offend unless confined to a secure facility. [3-11]

CIVIL ACTION commenced in the Superior Court Department on July 9, 2007.

The case was heard by *Thomas P. Billings,* J.

*Nadell Hill* for the defendant.

*Bethany Stevens,* Assistant District Attorney, for the Commonwealth.

SIKORA, J. After a five-day bench trial, a Superior Court judge found the defendant, David Husband, to be a sexually danger-ous person (SDP) and committed him to the Massachusetts Treatment Center for a period of one day to life. G. L. c. 123A, §§ 12-14. Husband challenges the sufficiency of the evidence for that finding. As a distinctive contention, he argues that the evidence failed to establish beyond a reasonable doubt that a statutorily required "personality disorder" made him likely to commit further sexual offenses; and that the evidence demon-strated, instead, that prolonged solitary confinement, not a personality disorder, had caused him to engage in sexually threaten-ing actions toward correction personnel. After an exhaustive survey of competing expert testimony, the judge concluded that the evidence established that Husband's longstanding antisocial personality disorder made it likely that the defendant would reof-fend and therefore rendered him sexually dangerous. For the fol-lowing reasons, we affirm.

*Background.* We summarize the judge's findings. We defer discussion of portions of the expert testimony to analysis of the legal issues.

At the time of trial Husband was forty-seven years old. He grew up in a turbulent family setting.[1] He began a long involve-ment with alcohol at age fifteen or sixteen. His sister described him as shy, sensitive, and devastated by his mother's absence.

Husband's criminal record began in April of 1978, when he was seventeen years old. In 1979, he served his first committed sentence, thirty days for breaking and entering a motor vehicle. His adult record includes a total of forty-seven convictions, mostly for property crimes and nonsexual assaults. Additionally, his disciplinary record while incarcerated contains numerous reports, including many in the last ten years of confinement. His reported conduct toward prison female medical personnel included sexual epithets, insults, taunts, threats, exposure, and masturbation in the course of incidents extending from 1998

---

[1]When Husband was twelve, his mother entered a residential treatment program for alcoholism and never returned home. Shortly after his mother's departure, his father left the home and moved in with a woman (whom he later married) and her children. Husband and his two sisters remained alone in the family home, until the father returned with his new family two years later.

into 2007. (The judge itemized and credited forty-four reports of misconduct during that decade, eighteen of which described sexualized affronts toward females.)

In the mid-1990s, while Husband was incarcerated at MCI-Gardner, he began psychotherapy with a clinical social worker named J.D.[2] The relationship between J.D. and the defendant quickly became personal and romantic rather than merely professional and therapeutic. When he finished his sentence in December of 1996, the consensual sexual relationship between J.D. and Husband continued for about eight months. Then, in August of 1997, J.D. told him that she was ending the relationship. Husband's violent and sexually aggressive reaction toward J.D., while her children were in the house, resulted in convictions of the governing offenses of assault with intent to rape and indecent assault and battery on a person over fourteen.

The same Superior Court jury convicted him also of three counts of assault and battery against J.D.[3] Upon the conviction of assault with intent to rape, the judge imposed a sentence of ten years; and upon the conviction of indecent assault and battery on a person over fourteen, a concurrent sentence of four to five years. The judge sentenced him to probation on the assault and battery convictions.

Since the beginning of his first committed sentence in 1979, Husband has spent most of his life in confinement. His longest period of freedom was the nine months prior to his arrest for the governing offenses in August of 1997.

In July, 2007, the Commonwealth petitioned for Husband's commitment as an SDP. G. L. c. 123A, § 12. The trial concluded in October of 2008. The judge's detailed findings, conclusions of law, and resulting order span fifty-six pages. This appeal ensued.

*Analysis.* An SDP is one "who has been . . . convicted . . . of a sexual offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in sexual offenses if not confined to a secure facility." G. L. c. 123A, § 1, as inserted by St. 1999, c. 74, § 6. The Com-

---

[2]We use initials in accordance with G. L. c. 265, § 24C.

[3]Husband was acquitted of four counts of rape, one count of assault and battery on a person over fourteen, and stalking, pertaining to the same episode.

monwealth must prove three elements beyond a reasonable doubt: (1) that the person was convicted of a sexual offense designated by the statute; (2) that he suffers from a mental abnormality or personality disorder; and (3) that, as a result of that mental abnormality or personality disorder, he is likely to commit further sexual offenses if not confined to a secure facility. See G. L. c. 123A, §§ 1, 14(d).

On appeal, Husband challenges the judge's determination on two grounds: (1) that the evidence failed to establish a personality disorder; and (2) that, even if he did suffer from a personality disorder, the evidence failed to show that the personality disorder made it likely that he would reoffend if not confined to a secure facility. He does not challenge the finding that he had been convicted of a statutorily enumerated sexual offense.

1. *Standard of review.* In response to a challenge to the sufficiency of the evidence, we inspect a finding under the settled standard: "whether, after viewing the evidence (and all permissible inferences) in the light most favorable to the Commonwealth, any rational trier of fact could have found, beyond a reasonable doubt, the essential elements of sexual dangerousness, as defined by G. L. c. 123A, § 1." *Commonwealth* v. *Blake*, 454 Mass. 267, 271 (2009) (Ireland, J. concurring), quoting from *Commonwealth* v. *Boyer*, 61 Mass. App. Ct. 582, 589 (2004). See *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979). Of particular importance in cases of appeal from the adjudication of SDP status is the canon that we defer to findings resting upon expert testimony, since "[w]eighing and crediting the testimony of witnesses during proceedings under G. L. c. 123A 'are for the trier of fact, and we will not substitute our judgment for that of the trier of fact.' " *Commonwealth* v. *Sargent*, 449 Mass. 576, 583 (2007), quoting from *Commonwealth* v. *Bradway*, 62 Mass. App. Ct. 280, 291 (2004). See *Commonwealth* v. *Boucher*, 438 Mass. 274, 275-276 (2002).

2. *Personality disorder.* Husband first challenges the sufficiency of the evidence for the finding that he suffers from a personality disorder. A "personality disorder" is defined as "a congenital or acquired physical or mental condition that results in a general lack of power to control sexual impulses." G. L. c. 123A, § 1, inserted by St. 1999, c. 74, § 4. Neither the

governing statute nor the Federal Constitution "require[s] express proof of a clinically defined mental illness." *Dutil, petitioner*, 437 Mass. 9, 15 (2002). In addition, contrary to the defendant's contention, the legal definition of personality disorder applicable to SDP proceedings is not required to match the clinical definition of personality disorder found in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) (DSM-IV).[4] See *Commonwealth v. Starkus*, 69 Mass. App. Ct. 326, 335-336 (2007) (SDP statute makes no reference to DSM-IV and does not limit mental conditions to those outlined in DSM-IV). The technical distinctions among various clinical diagnoses are immaterial so long as the Commonwealth proves beyond a reasonable doubt that the defendant suffers from a "personality disorder which makes [him] likely to engage in sexual offenses if not confined to a secure facility." G. L. c. 123A, § 1.

The Commonwealth presented expert testimony from two qualified examiners, Gregg Belle, Ph.D., and Michael Henry, Psy.D. Both experts testified that Husband suffered from a personality disorder not otherwise specified (NOS), with antisocial traits. Both the Commonwealth experts testified that Husband's personality disorder resulted in his inability to control his sexual impulses as evidenced by both the governing offenses and his extensive record of sexually aggressive and abusive conduct while incarcerated. In addition, three reports from 1985 and 1986, which resulted from G. L. c. 123, § 18(*a*), evaluations (§ 18[*a*] reports) conducted at the Bridgewater Treatment Center, were admitted into evidence, each of which reported Husband's diagnosis of a severe borderline personality disorder and stressed his need for treatment.

The defendant presented three experts, Daniel Kriegman, Ph.D., Leonard Bard, Ph.D., and Stuart Grassian, M.D.

---

[4]The DSM-IV definition of personality disorder requires that behaviors be traceable at least to early adulthood. The trial judge correctly observed that the SDP statutory definition of a personality disorder operates more broadly than the DSM-IV definition. However, the 1985 and 1986 Department of Correction reports created under G. L. c. 123, § 18(*a*), by two examiners contained diagnoses that Husband did suffer from a personality disorder in early adulthood. These reports would be evidence of a personality disorder under the DSM-IV definition, if the Commonwealth did need to satisfy the DSM-IV criteria.

Dr. Kriegman found no evidence of a personality disorder and instead opined that the defendant suffered from alcoholism (in remission) and posttraumatic stress disorder. Dr. Kriegman based this opinion on (1) the absence of evidence of a disorder before age fifteen,[5] (2) the absence of evidence of a disorder showing across ages and context, and (3) the occurrence of Husband's offensive behavior primarily in prison, and specifically in solitary confinement. Dr. Bard testified that Husband may suffer from a personality disorder NOS with antisocial and borderline features. His diagnosis accorded with that of the two qualified examiners for the Commonwealth. However, Dr. Bard cautioned that his "provisional diagnosis" rested solely on Husband's behavior during incarceration and isolation, and that it would not be predictive of his behavior outside prison. Finally, Dr. Grassian, an expert in the area of the effects of solitary confinement, testified that Husband suffered from attention deficit disorder, associated cognitive difficulties, depression, and alcoholism. In his opinion, Husband's aggressive sexual behavior resulted from aggravation of those conditions by prolonged periods of solitary confinement, and not from a personality disorder. He estimated that, after his early confinement for a year in a house of correction, Husband had spent almost the entirety of his twenty-six years of imprisonment in cell blocks segregated from the main prison population.

As the Commonwealth correctly indicates, Husband's claim is an attack upon the weight, not the sufficiency, of the evidence. Its resolution rests with the fact finder. *Commonwealth* v. *Lamb*, 372 Mass. 17, 23-24 (1977). The choice between the credibility of two sets of experts belonged to the judge as the trier of fact and as a firsthand observer of the testimony and demeanor of the witnesses under direct and cross-examination. See *Commonwealth* v. *Sargent*, 449 Mass. at 583.

The judge found that Husband suffered from a "personality disorder NOS" even though its specification had proved elusive. He credited the testimony of the qualified examiners and the early evidence from the § 18(*a*) reports. His finding included

---

[5]As discussed *supra*, Husband argues that the diagnosis of a personality disorder, as defined by DSM-IV, requires evidence of a disorder prior to adulthood. Again, we disagree that the DSM-IV definition governs.

the defendant's "general lack of power to control [his] sexual impulses." The judge cited Husband's "longstanding pattern of impulsivity, irresponsibility, recklessness, and disregard for and violation of the rights of others [which] has now entered the sexual realm" and which shows a "generalized lack of self control." The choice between alternative bodies of reasonably explained expert testimony remained with the trial judge. The Commonwealth carried its burden of proof of the element of "personality disorder." See *Commonwealth* v. *Reese*, 438 Mass. 519, 526 n.9 (2003) ("[D]iagnosis [of antisocial personality disorder] is adequate to satisfy the definitional requirement of a sexually dangerous person in G. L. c. 123A, § 1").

3. *Likelihood of reoffense.* The defendant contends that, even if the Commonwealth satisfied its burden of proof on the issue of a personality disorder, the evidence fails to show that it "makes" him likely to commit further sexual offenses if not confined to a secure facility.

The Supreme Judicial Court has defined "likely" as "reasonably to be expected in the context of the particular facts and circumstances at hand." *Commonwealth* v. *Blake*, 454 Mass. at 271-272 (Ireland, J., concurring), quoting from *Commonwealth* v. *Boucher*, 438 Mass. at 276. "In assessing the risk of reoffending, it is for the fact finder to determine what is 'likely.' " *Commonwealth* v. *Boucher*, *supra*. "Likely" is not a quantifiable statistical probability, but it must be more than a mere propensity or possibility. *Id.* at 277 ("likely" is not interchangeable with "more likely than not"). In each case, the fact finder must determine whether the risk reaches or fails to reach the level of being "likely" by evaluating (a) "the seriousness of the threatened harm," (b) "the relative certainty of the anticipated harm," and (c) "the possibility of successful intervention to prevent that harm." *Id.* at 276. We must affirm the decision below if we determine that, after viewing the evidence (and all permissible inferences) in the light most favorable to the Commonwealth, any rational trier of fact could have found, beyond a reasonable doubt, that Husband was "likely" to reoffend. *Commonwealth* v. *Blake*, *supra* at 271.

Dr. Belle based his opinion of likely reoffense on the grounds of (a) the nature of the governing offenses; (b) prison disciplinary

reports of behavior toward female correction and medical staff members including (i) masturbating at them and (ii) threatening and sexualized comments toward them; (c) throwing feces; (d) self-mutilation; and (e) deceitful, manipulative, and impulsive behavior.[6]

Dr. Henry found a likelihood of reoffense upon the similar basis of (a) a long history of criminal behavior; (b) an accumulation of institutional disciplinary reports; (c) contempt for the rights of others; (d) self-absorption; and (e) "poor sexual self-regulation, poor general self-regulation and lifestyle instability; marked intimacy deficits and interpersonal deficits; and attitudes tolerant of sexual assault."[7]

Both qualified examiners added (a) that Husband showed no acknowledgment of responsibility for the governing offenses against the victim; (b) that he blamed female staff for his behavior toward them; and (c) that he had not completed any sex offender therapy or treatment.

Both qualified examiners graded Husband on the risk assessment actuarial scale known as STATIC-99, comprised of twelve categorical risk factors applied to the subject's history, each valued at one point.[8] A score above six placed the subject at a "high" risk of reoffense. Dr. Belle graded the defendant at nine; and Dr. Henry at seven.

Husband's three experts presented countervailing opinions. Dr. Kriegman concluded that Husband was likely to commit further crimes, but not sexual crimes. While Dr. Kriegman tended to discredit the use of STATIC-99, particularly in this case, he employed it experimentally for Husband and gave him a score

[6]Dr. Belle relied also on correction reports attributing more than 600 obscene telephone calls to the defendant. The trial judge found that the Commonwealth had failed to prove that Husband was in fact the obscene caller for the purpose of the SDP trial. Therefore we exclude that alleged conduct from the evaluation of evidence.

[7]Like Dr. Belle, Dr. Henry imputed to Husband the hundreds of obscene telephone calls alleged in the disciplinary reports. For the reason previously stated, we exclude that information from the measurement of evidence.

[8]"The Static-99 risk assessment tool is an actuarial instrument designed to estimate the probability of sexually violent recidivism among adult males who have been convicted of at least one sexual offense against either a child or a nonconsenting adult." *Doe, Sex Offender Registry Bd. No. 10800* v. *Sex Offender Registry Bd.*, 459 Mass. 603, 636 n.33 (2011).

of five (moderate-high risk). Dr. Bard, using similar "actuarial" tools, placed Husband at a five on the STATIC-99 scale. He used additional statistical measurements and rated Husband at a low to moderate range of expected risk of recidivism.

Finally, Dr. Grassian found Husband's behaviors explicable as the effects of long-term solitary confinement. He did not specifically assess the risk of reoffense. He instead opined that Husband had done "remarkably well" after his last release from prison, and that his reentry into society was "relatively smooth" as evidenced by his "calming down, being able to stand stimulation, being able to stand intimacy, and being able to stand social stimulation."

The crux of Husband's argument is that upon this body of evidence the Commonwealth has not shown beyond a reasonable doubt that a statutorily required personality disorder "makes" him likely to commit sexual offenses; and that the evidence shows instead that prolonged solitary confinement has caused his pattern of general, not sexual, frustration and hostility. In addition, if the evidence were sufficient to support the required causal connection, the defendant faults the judge's decision for lack of an explicit finding of attribution of the likelihood of reoffense to the personality disorder, rather than to the other potential causes. This rationale banks heavily on the opinion of Dr. Grassian (and indirectly upon the view of Dr. Kriegman that the defendant's risk is one of general reoffense and not sexual reoffense). It includes the prediction that release from confinement will eliminate the cause of likely reoffense.[9]

In his "findings of ultimate fact," the judge addressed the contention that prolonged solitary confinement, and not a personality disorder, caused a likelihood of reoffense. He allowed that the anger and frustration of long-term isolation might constitute a concurrent cause of the likelihood of sexual reoffense. He then reasoned that concurrent causation by a recognized personality disorder and by the separate force of extended incarceration

---

[9]The defendant's brief includes a concise statement of the point.

"Therefore, based on the evidence presented by the [defendant's] experts, there is no reason to believe that the [defendant's] bizarre, threatening, and outrageous behaviors would not stop if he were released from custody."

rendered the defendant nonetheless an SDP within the meaning of the statute.[10]

As with the determination of a personality disorder, the findings of causation and likelihood reduced to a choice by the judge between alternative bodies of expert opinion, and to a question of weight and not sufficiency. "Experts' conclusions are not binding on the trier of fact, who may decline to adopt them in whole or in part. As a corollary, where testimony from various experts is conflicting, it is for the trier of fact to determine which expert's testimony to accept, if any." Brodin & Avery, Massachusetts Evidence § 7.4.3 (8th ed. 2007) (footnote omitted). Throughout that appraisal the judge will have had the advantage of direct observation of the witnesses' demeanor and credibility, especially under cross-examination.

The judge's assessment of the conflicting expert testimony here was exhaustive and fair. His subsidiary and ultimate findings compel the conclusion that he attributed the likelihood of

---

[10]The core of the judge's reasoning appears in several findings of ultimate fact.

"143. . . . I do not credit [certain of the defendant's claims of] accidents and misunderstandings. More substantial is the [defendant's] assertion that his sexual misconduct since the governing offenses has been an artifact of prolonged solitary confinement, unlikely to repeat itself once he is released.

"144. As discussed above, I believe this construction to be flawed in the [defendant's] case. Undoubtedly, his long periods of solitary confinement have taken their toll, and at least some of his behaviors (self-mutilation, suicide attempts/gestures, smearing of feces) closely resemble the irrational, self-destructive, but non-sexualized patterns commonly observed in this population, as described in Dr. Grassian's testimony and journal article. Others, however, are so threatening and so overtly sexualized that they are impossible to ignore from the standpoint of sexual dangerousness. There is no reason why an inmate could not be both traumatized by solitary confinement, and also sexually dangerous, and the evidence is strong that this is true of the [defendant].

"145. If the [defendant's] sexual aggression in prison has been the product of anger and frustration, moreover, this is hardly reassuring. The issue is, in large part, whether the [defendant] is likely to engage in sexual violence if released. Granting that anger and frustration may have played a role in his sexualized misconduct while incarcerated, one derives little comfort from it; the same could be said of many sexual assaults committed outside prison walls."

sexual reoffense to a personality disorder characterized by inveterate, impulsive aggression. He credited the view of the defendant's expert that solitary confinement had causally contributed to that likelihood. His overriding finding was that any concurrent cause by solitary confinement left intact the proof of personality disorder and likelihood of reoffense. "Taken as a whole, the [defendant's] record [shows] impulsivity, disregard for the rights of others, and a generalized lack of self control. The governing offenses, and his record in the decade since, indicate that this firmly rooted and longstanding constellation of characterological traits has now spilled over into the sexual realm." The available expert testimony furnished proof beyond a reasonable doubt for that ultimate finding.[11]

*Judgment affirmed.*

---

[11]As this case illustrates, expert testimony may propose alternate causes of the likelihood of reoffense. If the fact finder must choose between statutory (mental abnormality or personality disorder) and nonstatutory causation, specificity becomes essential. Bench trials will require distinct findings. Jury trials will benefit from precise special verdict questions.