NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-1052                                          Appeals Court

GEORGE SOUZA, petitioner.

No. 13-P-1052.

Suffolk.     June 3, 2014. – March 18, 2015.

Present:  Kantrowitz, Milkey, & Hanlon, JJ.

Sex Offender.  Practice, Civil, Sex offender, Directed verdict,
     Instructions to jury.  Evidence, Sex offender, Expert
     opinion.

     Petition filed in the Superior Court Department on February
2, 2009.

     The case was tried before Diane M. Kottmyer, J.

     Mary P. Murray for the Commonwealth.
     Michael A. Nam-Krane for the petitioner.

     HANLON, J.  George Souza filed a petition in Superior Court

seeking release from his civil confinement as a "sexually

dangerous person" (SDP).  See G. L. c. 123A, § 9.  At trial, the

jury was unable to reach a verdict and, thereafter, the trial

judge allowed Souza's motion for a directed verdict of not

guilty.  The Commonwealth appeals, arguing there was sufficient evidence to permit a retrial.  We agree and reverse.

Background.  We recite the evidence heard by the jury in the light most favorable to the Commonwealth.  Commonwealth v. Cowen, 452 Mass. 757, 763 (2008).  Souza has a significant adult criminal record, extending over a period from 1963 until his last conviction in 2000.[1]  In 1971, he pled guilty in New York to "rape in the second degree" for having "engaged in sexual intercourse with . . . [a] female less than . . . fourteen years of age."[2]  Souza has maintained that the victim was working as a

_____

[1] There was evidence that Souza first came to the attention of the police when he was eleven years old.  At the trial, his record showed Massachusetts convictions for indecent assault and battery on a child under fourteen, robbery, larceny from the person, breaking and entering with intent to commit a felony, and larceny from a building.  There were convictions in New York for criminal possession of a forged instrument, endangering the welfare of a child, and rape in the second degree.  The "counterfeiting and the endangering of a child's welfare . . . charge[s] [were apparently] a result of having three young adolescent boys essentially run the counterfeit money into various establishments and get change for objects that Mr. Souza then kept or split with the boys."

The record also indicates that Souza has "committed crimes in a number of [other] states including . . . Rhode Island, Oklahoma, Nevada, and California."

[2] The same indictment also charged Souza with, on or about May 25, 1971, until on or about June 7, 1971, two counts of "promoting prostitution in the first degree" by "knowingly advanc[ing] and profit[ing] from prostitution of a person less than sixteen years old, to wit, [a victim], aged thirteen."  A third count charged Souza with "promoting prostitution in the second degree," committed as follows:  Said defendant . . . advanced and profited from prostitution by managing,

"prostitute" at the time, that she looked eighteen to him, and that she agreed to engage in sex with him. Nevertheless, in one interview, he also stated, "[A] little girl came . . . it was my fault . . . this little child . . . I should never [have] went with this child." When asked how old the girl had been, he said, "I have no idea . . . I don't even want to guess." He was then twenty-seven years old. On another occasion, in 2011, Souza asserted that the police entered the room where he was with the victim "before any sexual activity took place." More recently, in a group therapy session in 2012, Souza, discussing the New York offense, told the group that he had "engag[ed] in sexual intercourse with a 15-year-old prostitute . . . [and] that she did not look 15 because they make them bigger in New York."

Souza's conviction in 2000 for indecent assault and battery on a child under the age of fourteen arises out of an incident in 1990 with a nine year old boy in Fall River. After he was

---

supervising, controlling and owning, a house of prostitution and a prostitution business and enterprise involving prostitution activity by two prostitutes." Those charges apparently were dropped, and, because the names of the victim or victims were redacted from the copy of the indictment introduced at trial, it is not completely clear whether the victim of the rape charge was also the subject of the prostitution charges. However, in a 2003 evaluation by John Daignault, Psy.D., Souza stated that, after he paid the victim in the 1971 rape case, the victim "asked to stay with him and he let her, and he ended up getting arrested several days later because he was letting her 'trick' out of his house and the police investigated."

arrested, Souza defaulted and left the State. Arrested on another charge in New York, Souza was returned to Massachusetts and pleaded guilty in 2000. The Commonwealth alleged that Souza had offered the victim a ride on a motorcycle, and then accosted him, pulling down his pants and the victim's pants and then putting his penis in the victim's mouth and ejaculating. Souza told the victim not to tell his mother or he would "hurt him bad." At the plea hearing, Souza admitted only to rubbing the victim's penis and thereafter denied any involvement in the incident, accusing the victim's mother of fabricating the story and his lawyer of forcing him to plead guilty.

For that incident, Souza received a sentence of three years to three years and one day. Before his release, the Commonwealth filed a petition alleging that Souza was sexually dangerous under the provisions of G. L. c. 123A, §§ 1, 12-16. After a jury-waived trial, the judge found Souza to be an SDP and committed him to the Massachusetts Treatment Center (Treatment Center) for an indefinite term. See G. L. c. 123A, § 14. Souza appealed, challenging both the sufficiency of the evidence that he was an SDP and the use of statements he made to the Commonwealth's expert. This court affirmed in a memorandum and order pursuant to our rule 1:28. See Commonwealth v. Souza, 70 Mass. App. Ct. 1105 (2007).

Souza's record while incarcerated reveals a number of incidents. He was the victim of an assault by other inmates at least once. In addition, he was disciplined for some relatively minor infractions, along with physical altercations on a number of occasions. At the Treatment Center, he received twenty-three "Observation of Behavior Reports" (OBRs) during the decade he was confined there. Those records included some substantiated incidents of violence: in 2004, Souza got into a physical altercation with his roommate, and in February of 2012, he spat at and pushed another resident and then banged his own head on a cell door to make it look as though a guard had attacked him.

It is undisputed that Souza did not complete sex offender treatment while he was at the Treatment Center. In fact, although he had begun the initial phase of treatment during his incarceration for the incident with the nine year old boy, Souza did not enroll in any treatment during his first six years at the Treatment Center. Despite his regular attendance in treatment classes thereafter, Souza made only limited progress. At the time of trial, when Souza was sixty-nine, he remained in the early stages of the treatment programs offered to him.[3]

---

[3] In 2012, the Treatment Center subjected Souza to a "penile plethysmograph" (PPG) test designed to measure the extent to which he was aroused by various appropriate and inappropriate stimuli. According to the test evaluator, Souza did not demonstrate any significant arousal to any stimuli, and, based

In March of 2012, a divided Community Access Board (CAB) concluded in a four-to-one vote, that Souza no longer met the criteria of an SDP.  The two qualified examiners (QEs) who examined him also were divided on the question.

The Commonwealth's case at trial.  At trial, the Commonwealth relied primarily on the testimony of two experts.[4] Frederick W. Kelso, Ph.D., one of the QEs, testified that Souza suffered from "pedophilia" and "antisocial personality disorder" (APD), as those terms are defined in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (rev. 4th ed. 2000) (DSM-IV).  Kelso opined that those mental conditions interfered with Souza's ability to control his sexual urges, and that he was likely to reoffend if not confined.  He identified Souza's "risk factors" as having committed a prior sex offense, including a sex offense against a stranger, sex offenses against children not related to him, and a sex offense against a male.  Kelso also noted Souza's "past

_____

on those results, behavioral conditioning was not recommended at that time.

[4] Two other Commonwealth witnesses testified briefly.  The deputy superintendent of classification and treatment at the Treatment Center testified that Souza exercised regularly, running laps in the exercise yard, and that Souza has spoken to him about how important it is for him to stay in good physical shape.  The assistant treatment coordinator at the Treatment Center testified that Souza had been suspended from participation in group therapy for a "physical altercation that took place" between Souza and another resident and that there had been unexcused absences from the group as well.

experience of deviant sexual preferences, and his failure to complete sex offender treatment at the Treatment Center."  At the time of the Fall River incident, Souza was "then forty-six years old, and the victim of the sex offense was a boy who was then nine years and one month old."

Niklos Tomich, Psy.D., chair of CAB, filed a minority report from the CAB, concluding that Souza was still sexually dangerous.  He essentially agreed with Kelso.  Tomich described Souza as an "outlier. . . .  [I]t means somebody who differentiates from the norm."[5]  According to Tomich, Souza "essentially showed an enduring and rather chronic course of antisocial behavior.  That has been unremitting.  He has shown very little remorse.  He essentially continues to obfuscate responsibility for the crimes for which he was convicted, especially the sex offenses, which is what [Tomich was] mostly concerned about."

Significantly, Tomich also opined that Souza "meets the criteria for pedophilia."[6]  He pointed out that "both his victims

---

[5] Tomich explained that Souza "has two convictions of sexual offenses, but he also has a very long criminal history that includes seventeen additional convictions . . . including other types of offenses. . . . Subsequent to his most recent period of incarceration and then civil commitment, he also has approximately twenty-five disciplinary reports, some of them of a violent nature."

[6] In her memorandum of decision, the judge stated that, while Tomich found that Souza exhibited signs of pedophilia, "he

were children [and that] . . . [w]hat stood out . . . for those offenses was the fact that they occurred over a very long period of time.  And, in addition, he has both a male victim and a female victim.  So, this tends to increase his victim pool."  In addition, Tomich found significant the fact that the girl victim was a stranger, thus increasing the pool of potential victims, and that, when Souza committed the offense against the boy victim, he knew about the possible repercussions in the criminal justice system, having previously served a four year sentence in New York.

Tomich contrasted those "static factors," factors that do not change over time, with "what are called dynamic factors or factors that . . . may change over time, that may get stronger or weaker, depending on the situation [Souza's] in."  In this case, those factors also supported Tomich's conclusion that Souza was an SDP, particularly his "unwillingness to abide by the mores and folkways and rules of society.  He just doesn't want to do that and he hasn't."  Tomich also considered Souza's unwillingness to take responsibility for either offense.

---

did not diagnose Mr. Souza with" that disorder.  Although the import of the distinction the judge drew is not entirely clear, Tomich made it plain that he did in fact diagnose Sousa with pedophilia.  In response to the prosecutor's question, "Did you diagnose Mr. Souza with anything else?"  Tomich replied, "Yes."  To the question, "And what was that?"  Tomich replied, "He also meets the criteria for pedophilia."

Tomich did consider protective factors, including Souza's age of sixty-nine, an age at which sex offenders often are considered less dangerous. Tomich noted that Souza's second sex offense took place when he was forty-six and that his last criminal arrest took place when he was fifty-five; in addition, Souza's behavior in the Treatment Center included offenses that could have been charged as criminal had he not been held. Finally, while Souza was engaged in treatment, he was only at a preliminary stage of that treatment, a level that Tomich found "inadequate." In support, he pointed to a treatment note from a group therapy session less than two months before the trial. In that group, Souza had given three different accounts of the New York offense and the surrounding circumstances within the time of one session. Tomich stated that he wasn't suggesting that Souza was lying. Instead, he stressed that Souza "is disordered and requires treatment. . . . [A] function of his disorder is that he distorts his history and distorts events in the record. That complicates and confounds treatment."

Souza's case. Souza countered with testimony from four experts: Michael G. Henry, Psy.D. (the other QE), Michael J. Murphy, Ed.D. (the CAB member who authored the CAB majority report), and two privately-retained psychologists. Focusing especially on Souza's advanced age, the PPG results, and the limited evidence that he suffered from any sexual compulsions at

the time of trial, those experts opined that Souza was not currently sexually dangerous and did not present a likelihood of reoffending.

The directed verdict. Souza moved for a directed verdict after the Commonwealth rested its case and again at the end of the trial. The judge reserved ruling on the motion and sent the case to the jury.[7] The jury reported that they had reached "an impass[e]," and they "remain[ed] deadlocked" even after receiving a Tuey-Rodriquez charge.[8] See Commonwealth v. Rodriquez, 364 Mass. 87, 101-102 (1973). The judge discharged them and allowed both sides to submit briefing on Souza's motion for a directed verdict. In a memorandum of decision issued on April 11, 2013, the judge allowed Souza's motion. Judgment entered, and this appeal ensued.[9]

-----

[7] The case had been tried earlier to a different jury, but a mistrial was declared after Souza became ill.

[8] In a jury trial held on a G. L. c. 123A, § 9, release petition, the jury may act through a five-sixths majority, as is generally true in civil cases. Sheridan, petitioner, 422 Mass. 776, 780-781 (1996). See generally G. L. c. 234, § 34A.

[9] Judgment entered in Souza's favor on April 17, 2013, but the judge temporarily stayed Souza's release to allow the Commonwealth time to determine whether to appeal. The Commonwealth filed its notice of appeal on April 29, 2013. It then requested that Souza's release further be stayed, and Souza cross-moved, requesting that he be released pending appeal subject to various specified conditions, including global positioning system (GPS) monitoring. The trial judge allowed Souza's motion, and a single justice of this court denied the Commonwealth's motion for a stay pending appeal. The

In her memorandum of decision, the judge ruled that "[a] properly instructed rational juror could not find that the Commonwealth had proved beyond a reasonable doubt that petitioner suffers from Pedophilia as defined in the DSM IV." In a footnote, she stated, "[a]ll of the experts, including Dr. Kelso, testified that the criteria for Pedophilia in the DSM-IV include 'over a period at least 6 months, recurrent, intense, sexually arousing fantasies, sexual urges or behaviors involving sexual activity with a prepubescent child or children (generally 13 years of age or younger).'"  While the judge acknowledged that the nine year old male victim in the 1990 incident clearly was prepubescent, she found the evidence insufficient to support a conclusion that the thirteen year old female victim in the 1971 incident was prepubescent.  In so doing, the judge relied on the testimony of a defense expert, saying that "[t]he Tanner scale, which is used by pediatricians to stage physical sexual development of children, places a 13 year old at 85-90% post-pubescent."  From this, the judge concluded that it was "very unlikely" that the thirteen year old was prepubescent and

Commonwealth then pursued a stay through filing a petition pursuant to G. L. c. 211, § 3.  A single justice of the Supreme Judicial Court denied that petition on June 26, 2013.  Souza eventually was released pursuant to an amended "order of discharge" entered on June 28, 2013, that included GPS monitoring and nine other conditions.  He has completed all of his sentences and has no probation or parole conditions remaining on any underlying offense.

therefore the conclusion of both Commonwealth experts, based as it was on "an insufficient evidentiary foundation," was not sufficient to meet the Commonwealth's burden of proof.

While the judge acknowledged that the "evidence was sufficient to support a finding beyond a reasonable doubt that petitioner today suffers from an Antisocial Personality Disorder," in her view, that diagnosis alone was not sufficient because, as she said (rightly), "to establish sexual dangerousness, the Commonwealth must prove beyond a reasonable doubt that the mental condition causes serious difficulty in controlling sexual impulses today."  She concluded:

> "[T]he petitioner is 69 years old today.  His most recent sexual offense or sexual misconduct of any kind was in 1990.  He was a fugitive for eight years and has been incarcerated since 1999.  There is no evidence of any sexual interest in children or sexual acting out of any kind during the years petitioner lived in the community on bail and as a fugitive (1991-1999) or during the thirteen years since his incarceration on the 1990 offense and subsequent civil commitment (1999 to the present)."

Given the fact that the "only evidence of sexual interest in children on the part of petitioner are the crimes committed in . . . 1971 and 1990," the judge dismissed as inappropriate considerations of Souza's failure to engage in treatment, score on the "Static 99" and "antisocial tendencies."

Discussion.  Sufficiency.  The issue is "whether, after viewing the evidence (and all permissible inferences) in the light most favorable to the Commonwealth, any rational trier of

fact could have found, beyond a reasonable doubt, the essential elements of sexual dangerousness as defined by G. L. c. 123A, § 1." Commonwealth v. Blake, 454 Mass. 267, 271 (2009) (Ireland, J., concurring), quoting from Commonwealth v. Boyer, 61 Mass. App. Ct. 582, 589 (2004). Applying that standard, we are satisfied that the Commonwealth's evidence here was sufficient to reach the jury.

As relevant to this case, a "'[s]exually dangerous person', [is] any person who has been . . . (iii) previously adjudicated as such by a court of the commonwealth and whose misconduct in sexual matters indicates a general lack of power to control his sexual impulses, as evidenced by repetitive or compulsive sexual misconduct by either violence against any victim, or aggression against any victim under the age of 16 years, and who, as a result, is likely to attack or otherwise inflict injury on such victims because of his uncontrolled or uncontrollable desires." G. L. c. 123A, § 1, as appearing in St. 1999, c. 74, § 6. As the Commonwealth argues, the first two elements of the statute are not at issue.

In support of the third element, the Commonwealth offered two expert witnesses, each of whom testified that, in his opinion, Souza was an SDP. There was no challenge to the expertise of either witness, and the testimony itself was admitted without objection. Each of the Commonwealth expert

witnesses testified that Souza suffered from antisocial personality disorder and pedophilia. "[E]ither diagnosis is adequate to satisfy the definitional requirements of a sexually dangerous person in G. L. c. 123A, § 1." Commonwealth v. Reese, 438 Mass. 519, 526 n.9 (2003). Kelso testified that, in his opinion, Souza's behavior in committing the two separate sexual offenses was repetitive and compulsive,[10] and "at the present time, Mr. Souza is not adequately able to control his sexual impulses and would not be able to adequately control his sexual impulses if he were to now be released from the Treatment Center." Tomich also testified that Souza's offenses were repetitive and compulsive and that he was unable to "effectively intervene in or control his sexual impulses." Each expert opined that, "if released, Mr. Souza would be likely to re-offend sexually if not confined to a secure facility."

The judge's conclusion to the contrary rests significantly upon her acceptance of the defense witness's testimony about the "Tanner scale['s]" definition of prepubescence and the consequences of that definition for the DSM-IV's definition of

---

[10] Dr. Kelso noted that, notwithstanding the fact that Souza was put on notice by the State of New York in 1971 that his behavior in committing the sexual offense against the young girl was "inappropriate and criminal and that engaging in that kind of conduct would result in a serious negative consequence, incarceration," Souza went on to commit a second sexual offense in Massachusetts, which "speaks to the sense that he's compelled to engage in the behavior even after he experiences a negative consequence."

pedophilia.  That was an issue of credibility that should have been left to the jury.  "The matter of how much weight is to be given a witness, particularly an expert witness, is a matter for the trier of fact . . . .  See Hill, petitioner, 422 Mass. 147, 156 (1996).  This is particularly true of experts in the medical field, who regularly are permitted to testify on the basis of examination of records and other materials with respect to an issue in dispute."  Commonwealth v. Cowen, 452 Mass. at 762.

As the courts have noted repeatedly, "the sexually dangerous persons statute makes no reference to [the DSM-IV], nor does it set forth any requirement that the statutory definition of mental abnormality be limited to the abnormalities outlined in the DSM-IV.  Cf. Doe, Sex Offender Registry Bd. No. 1211 v. Sex Offender Registry Bd., 447 Mass. 750, 765 n.13 (2006) ('[p]edophilia is a psychiatric disorder, not a legal classification')."  Commonwealth v  Starkus, 69 Mass. App. Ct. 326, 336 (2007).  See Commonwealth v. Husband, 82 Mass. App. Ct. 1, 5 (2012) ("[T]he legal definition of personality disorder applicable to SDP proceedings is not required to match the clinical definition of personality disorder found in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) (DSM-IV). . . .  The technical distinctions among various clinical diagnoses are immaterial so long as the Commonwealth proves beyond a

reasonable doubt that the defendant suffers from a 'personality disorder which makes [him] likely to engage in sexual offenses if not confined to a secure facility.'  G. L. c. 123A, § 1").

Equally important, the DSM-IV definition of pedophilia on its face describes prepubescent as "generally age 13 or younger."  Commonwealth v. Starkus, supra at 336.  It is only the gloss added by the defense expert's definition of prepubescence that permitted the judge to opine that it was "very unlikely" that this thirteen year old female victim was "prepubescent" in 1971, despite Souza's description of her (at least once) as having been a "little child" when he raped her. In fact, regardless of the precise state of the child's anatomical development, this victim was far below the age of consent and Souza's actions with her, at age twenty-seven, reasonably could be seen by a factfinder as manifesting a form of "mental abnormality" within the meaning of the statute.

Nor can the petitioner's age or the length of time since his last conviction for a sex offense be considered dispositive here.  Each of the Commonwealth's experts considered those factors as protective and reasonably concluded that, considering all of the factors, they did not change the assessment.  For example, Kelso relied in part on the so-called "Static 99R" model, a predictive tool that takes into account a subject's age.  Applying that model to the particulars of Souza's offenses

and history, Kelso scored him as a five or a six, the latter score falling into the range of what is considered a high risk of reoffending.[11]  Thus, the jury had before it empirically-based evidence that Souza presented a high risk to reoffend notwithstanding his age.

The law is clear that the lapse of time, by itself, is not dispositive, particularly when the petitioner has been held for a significant period of time in a secure environment with no opportunity to interact with young children.  See Commonwealth v. Blanchette, 54 Mass. App. Ct. 165, 178 (2002) ("[T]he judge appears to have reduced the grounds for the expert's opinion only to [the petitioner's] prior sex crimes, ignoring in the process other factors which he considered when forming his opinion, such as [the petitioner's] personal history and [his] decision, while incarcerated, to decline sexual offender

---

[11] In Kelso's testimony and his report, he referred to "Static-99."  Asked by the prosecutor to explain what that was, Kelso responded that it was "a very widely used sex offender risk assessment instrument."  A different version, "the Static-99R adjusts the age item so that if you're an older sex offender, your advanced age is taken into account in terms of your total score."  Kelso testified that Souza's score was slightly lower on the Static-99R than on the Static-99, but that he remained a high risk to offend, even with the lower score. Specifically, Kelso testified that "while [he thought Souza's] current age [was] one factor that merits consideration in the risk assessment, [he didn't] think it so overwhelm[ed] his status on the other risk factors as to be the only risk factor worthy of consideration."  In particular, Kelso noted that Souza was forty-six when he committed the 1990 sex offense with the boy victim.

treatment.  As to the latter, the Supreme Judicial Court cogently observed in . . . Hill, [petitioner,] 422 Mass. . . . [at] 157, . . . that

> '[e]xamples of recent conduct showing sexual dangerousness may often be lacking where the individual's dangerous disposition is of a sort that there will be no occasion for that disposition to manifest itself in a secure environment.  And it cannot be the case that an individual's refusal to submit to examination or to participate in treatment, in which his current dispositions might manifest themselves, will more or less automatically guarantee himself a favorable determination'").

The court's language in Commonwealth v. Reese, 538 Mass. at 526 is instructive here.  "It is . . . apparent from the record that the ruling is an expression of the judge's personal conclusion regarding the expert[s'] credibility, based on [her] own opinion of the proper application of the DSM-IV, and the significance of the differences between [the experts'] testimony and the DSM-IV text.  This was error.  The testimony of the expert[s] is not 'so incredible, insubstantial, or otherwise of such a quality that no reasonable person could rely on it.' Commonwealth v. Blanchette, supra at 175."

Jury instructions.  The Commonwealth also argues that the judge erred in instructing the jury with regard to the extent it was to rely on the testimony of Kelso (who testified as a QE), as opposed to the testimony of Tomich (who did not). Specifically, based on her reading of Johnstone, petitioner, 453 Mass. 544, 553 (2009), the judge instructed the jury that:

> "You heard of testimony from Dr. Tomich, a representative of the community access board. The law permits a representative of the community access board to testify in all proceedings like this one, and you may certainly rely upon the testimony of Dr. Tomich. However, you cannot find that the petitioner, Mr. Souza, is sexually dangerous based solely on the testimony of Dr. Tomich. In order for you to find that Mr. Souza is today a sexually dangerous person, you must find support for that determination in the opinion that [sic] Dr. Kelso, who testified as a qualified examiner."

Because the propriety of this instruction is likely to arise again in a retrial, we address it now.

We agree with the Commonwealth that such an instruction is not compelled by Johnstone, and that it is otherwise inadvisable. Johnstone held only that the Commonwealth cannot continue to pursue SDP confinement of someone unless at least one of the two assigned QEs concludes that the person is an SDP. Id. at 553. That precondition was satisfied here. As the judge herself recognized, in determining whether someone is an SDP, jurors are not precluded from relying on evidence from non-QE sources. The judge's efforts to acknowledge this to the jury, while still trying to create a special evidentiary role for the QE, led to an instruction that was confusing at best and not a fair statement of the law. Where, as here, the gatekeeping role served by QEs has been satisfied, and the Commonwealth offers additional expert testimony, a trial judge should refrain from

suggesting the relative weight the jury can or should assign to the various Commonwealth experts.[12]

Conclusion.  We vacate the judgment and remand this matter to Superior Court for further proceedings consistent with this opinion.

So ordered.

---

[12] The Commonwealth also seeks review of Souza's release on conditions pending appeal.  However, it did not file a notice of appeal regarding any of the orders that allowed his release pending appeal, and therefore cannot seek review of such orders now.  As Souza points out, the propriety of his release pending appeal is also now moot.

MILKEY, J. (dissenting).  The majority's well-reasoned opinion has a surficial logic that is difficult to contest.  In addition, I agree that it is important that judges usurp neither the fact-finding role assigned to juries, nor the gatekeeping role assigned to "qualified examiners" (QEs) pursuant to G. L. c. 123A.  Nevertheless, for the reasons set forth below, I ultimately agree with the trial judge that the Commonwealth's evidence that George Souza is currently a "sexually dangerous person" (SDP), as defined by G. L. c. 123A, § 1, was so insubstantial that, as a matter of law, it cannot justify his continued detention.  I therefore respectfully dissent.

In examining the sufficiency of the Commonwealth's proof, it is important to consider the extraordinary context in which this dispute arises.  It is uncontroverted that Souza has both committed odious crimes and fully served his punishment for those crimes; indeed, he already has been deprived of his liberty for almost a decade after his prison term ended.  The Commonwealth seeks to have him reconfined not in punishment for his past crimes but in anticipation that he may commit future ones.  In this context, the ordinary rule barring propensity evidence does not apply.  In fact, propensity is the main focus of SDP proceedings, and experts are called upon to speak directly to that issue (with seeming oracular certitude).  Contrast Commonwealth v. Sepheus, 468 Mass. 160, 172 (2014)

(defense counsel determined to have been constitutionally ineffective for failing to move to strike expert testimony that went directly to defendant's guilt).

By definition, preventative detention schemes allow people to be locked up for crimes they indisputably have not committed, even in the face of the constitutional presumption of innocence. As the United States Supreme Court has held, the constitutionality of such schemes depends on the theory that the people so confined suffer from distinct mental conditions that prevent them from controlling their dangerous behaviors in the future. Kansas v. Hendricks, 521 U.S. 346, 358-360 (1997). It necessarily follows that, absent an adequate medical foundation, the constitutionality of continued confinement is called into question. See id. at 373 (Kennedy, J., concurring) ("[I]f it were shown that mental abnormality is too imprecise a category to offer a solid basis for concluding that civil detention is justified, our precedents would not suffice to validate it").[1]

---

[1] See also Matter of State of N.Y. v. Shannon S., 20 N.Y.3d 99, 109-110 (2012) (Smith, J., dissenting), quoting from Kansas v. Crane, 534 U.S. 407, 413 (2002) ("[U]nless 'mental abnormality' is defined with scientific rigor, [sexual dangerousness] statutes could become a license to lock up indefinitely, without invoking the cumbersome procedures of the criminal law, every sex offender a judge or jury thinks likely to offend again[; such statutes] must be limited to people who can be shown by scientifically valid criteria to have a 'serious mental illness, abnormality, or disorder' -- one that distinguishes them 'from the dangerous but typical recidivist convicted in an ordinary criminal case'").

This constitutional overlay needs to be kept in mind in assessing the adequacy of the nature and quantum of the Commonwealth's evidentiary proof.  When such considerations are taken into account, the Commonwealth's proof here falls short of acceptable norms.

Certainly, the majority is correct that existing cases state that judges in SDP cases must proceed with caution before directing a verdict against the Commonwealth (or issuing a like order finding the Commonwealth's case deficient as a matter of law).  Thus, where there are competing expert opinions on whether someone is an SDP, a judge is not free to pick and choose which opinions to credit; that job falls to the jury. See Commonwealth v. Reese, 438 Mass. 519, 525-526 (2003). However, the cases do not stand for the proposition that once a QE has opined that someone is an SDP, a judge therefore must allow the case to go to the jury.  To the contrary, they continue to recognize that a judge properly may terminate an SDP proceeding if the Commonwealth's evidence is "so incredible, insubstantial, or otherwise of such a quality that no reasonable person could rely on it to conclude that the Commonwealth had met its burden of proof."  Id. at 524, quoting from Commonwealth

v. <u>Blanchette</u>, 54 Mass. App. Ct. 165, 175 (2002).[2]  In my view, this is just such a case.

Souza was sixty-nine years old at the time of trial.  At that point, the statutory rape he committed was over four decades old, and the indecent assault and battery on a child (the only other sex offense at issue in this case) was over two decades old.  As the Commonwealth's lead expert, Frederick W. Kelso, Ph.D., himself acknowledged, peer-reviewed empirical studies show that once sex offenders reach their sixties and seventies, they "tend not to be very likely to commit future sex offenses."  Of course, that concession by itself does not present an insurmountable obstacle to the Commonwealth.  Even if sex offenders generally are not very likely to reoffend at Souza's age, this does not preclude proof that Souza in

---

[2] The Commonwealth suggests that the QE's gatekeeping role effectively precludes a trial judge from scrutinizing the sufficiency of the evidence.  In my view, the extraordinary context of preventative detention demands that judges continue to play such a role.  Moreover, as this case well illustrates, in light of how the SDP scheme is structured, relying on juries to weed out unmeritorious SDP cases goes only so far.  Although the Commonwealth was unable at trial to convince the requisite number of jurors to find that Souza remains an SDP, he now -- over five years after his G. L. c. 123A, § 9, petition was filed -- again faces the prospect of indefinite confinement.  After retrial, he could be confined even in the absence of a jury finding that he currently is an SDP so long as a sufficient number of jurors held out for such a finding.  This presents serious cause for concern, especially given that the underlying subject area is one that is "ruled by emotions." <u>Commonwealth</u> v. <u>Sullivan</u>, 82 Mass. App. Ct. 293, 319 (2012) (Milkey, J., dissenting).

particular suffers from mental conditions that render him likely to do so. However, such proof is lacking on the current record.

The Commonwealth's experts relied in great part on their classifying Souza as a "pedophile" within the meaning of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (rev. 4th ed. 2000) (DSM-IV). According to them, it was the combination of pedophilia and "antisocial personality disorder" (APD) that created the undue risk that he would reoffend. In the words of the Commonwealth's second expert, psychologist Niklos Tomich, "Mr. Souza's Pedophilia results in his deviant arousal and behavior and his Antisocial Personality Disorder provides him the psychological means to engage behaviorally in, and then excuse, his behavior."

According to the DSM-IV, "a diagnosis of pedophilia requires '[a] period of at least six months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 or younger).'" Commonwealth v. Starkus, 69 Mass. App. Ct. 326, 336 (2007), quoting from the DSM-IV. As applied to the facts here, this required proof that the 1971 victim was prepubescent. The trial judge found the Commonwealth's proof of that point legally insufficient. The majority rejects the judge's reasoning on three grounds: (1) the Commonwealth is not bound by the definitions of the DSM-IV,

(2) the state of the 1971 victim's anatomical development is irrelevant because she was in any event well below the age of consent, and (3) the Commonwealth put forward sufficient proof that the 1971 victim was prepubescent (thus in any event satisfying the definition of "pedophilia" set forth in the DSM-IV).  I address these points in that order.

We have long recognized the DSM as the standard diagnostic authority in the psychiatric and psychological professions.  See Lambley v. Kameny, 43 Mass. App. Ct. 277, 278 n.4 (1997).  Nevertheless, as the majority correctly points out, in building a case that a sex offender suffers from a "mental abnormality" or "personality disorder," within the meaning of the SDP statute, the Commonwealth is not limited to those mental conditions enumerated and defined in the DSM.  See Commonwealth v. Husband, 82 Mass. App. Ct. 1, 4-5 (2012), and cases cited.  Of course, this does not prohibit Commonwealth experts from relying on the DSM; indeed, given the authoritative stature that the DSM enjoys in the medical community, it is hardly surprising that many experts would base their opinions on that source.  Where, as here, the Commonwealth experts did just that, it is fair and appropriate to hold them to this, and the cases that the majority cites are not to the contrary.[3]  When the

---

[3] Commonwealth v. Reese, 438 Mass. at 520, was an appeal from a judge's finding of no probable cause after a hearing

Commonwealth's case is predicated upon a specific expert diagnosis of pedophilia as defined in the DSM, a lack of evidence of one of the definitional criteria may not be excused. Otherwise, the Commonwealth would be relieved of its burden of proving the underlying facts on which its expert's diagnosis was based.  See Narducci v. Contributory Ret. Appeal Bd., 68 Mass. App. Ct. 127, 135 (2007) (noting the distinction between an expert's ultimate conclusion and the "assumed" facts, which must be proved, on which the opinion is based).

As the majority also accurately notes, the 1971 victim was well under the age of consent regardless of whether she was prepubescent.  Therefore, the state of her anatomical development is irrelevant for purposes of determining whether a crime had been committed.  However, whether Souza committed a crime and whether his actions show that he suffered from a particular "mental abnormality" are distinct questions.  The DSM-IV does not classify an adult's attraction to anatomically developed but still underage adolescents as a "mental

---

under G. L. c. 123A, § 12(c).  The Supreme Judicial Court explained that at least in that context, the Commonwealth's expert could rely on clinical observations and experience independent of the DSM criteria to make a diagnosis of pedophilia.  Id. at 525-526.  Reese thus involved a situation in which the Commonwealth's expert explained that he was not resting his diagnosis on the DSM-IV.  Reese does not say that where an expert relies on the DSM-IV at trial, the Commonwealth is excused from producing evidence that the DSM-IV criteria have been met.

abnormality."[4]  While the Commonwealth's experts could have sought to explain why they considered Souza as suffering from "pedophilia" apart from the definition in the DSM-IV, they did not do so.[5]

The question remains whether the Commonwealth in fact offered sufficient proof that the victim of the 1971 crime was prepubescent.  Although the DSM-IV notes the unremarkable fact that prepubescent children are "generally age 13 or younger," it of course does not define prepubescence in those terms.  It does not follow, except through false logic, that someone who is thirteen or younger therefore must be prepubescent.  Even if the judge credited the defense experts' definition of prepubescence (instead of leaving that question to the jury), her ruling does not depend on this.  The overriding point is that the Commonwealth failed to offer the proof that its own experts' theory of Souza's alleged "mental abnormality" demanded.  Finally, to the extent that the majority concludes that Souza's

---

[4] That is hardly surprising given that, as Judge Smith of the New York Court of Appeals trenchantly has observed in writing for a three-judge dissent, "the idea that a man's mere attraction to pubescent females is abnormal is absurd."  Matter of State of N.Y. v. Shannon S., 20 N.Y.3d 99, 111 (2012) (Smith, J., dissenting).

[5] I recognize that lay jurors presumably would consider Souza a "pedophile" within the far broader everyday use of that term.  But that underscores the constitutional concerns raised by allowing experts to untether their opinions from the stricter definitions accepted by the medical community as to what constitutes a "mental abnormality."

isolated references to the 1971 victim as "little" could constitute proof beyond a reasonable doubt that she was prepubescent, I disagree.

With the facts necessary to support the experts' diagnosis of pedophilia not having been put in evidence, the experts' opinion on that point cannot be used to avoid a directed verdict.  See LaFond v. Casey, 43 Mass. App. Ct. 233, 237-238 (1997).[6]  As we recently said, an expert opinion "premised on facts that [the expert] had gratuitously assumed and conjecture drawn from an insufficient evidentiary foundation . . . [is] inherently flawed and legally incompetent."  Commonwealth v. Acosta, 81 Mass. App. Ct. 836, 843 (2012).

To be sure, the Commonwealth's failure to establish that Souza was properly classified as a pedophile does not mean that it cannot prove that he is an SDP.  The majority is correct that the case law makes clear that proof that someone suffers from "antisocial personally disorder" (APD) by itself can be "adequate to satisfy the definitional requirements of" being an SDP.  Commonwealth v. Reese, 438 Mass. at 526 n.9.  In other words, where the Commonwealth has proven APD, there is no threshold requirement that it prove a second medical condition.

---

[6] See also Patterson v. Liberty Mut. Ins. Co., 48 Mass. App. Ct. 586, 592-593 (2000), and cases cited (an expert's opinion must be "based solely on the expert's 'direct personal knowledge' or admissible evidence in the record and not on assumptions that are not established by such evidence").

However, it does not follow that a diagnosis of APD, without more, constitutes sufficient proof.  This is especially true where, as here, the experts testified that it was the very combination of pedophilia and APD that caused the undue risk of sexual dangerousness (thus making proof of both prongs critical).

A close examination of the Commonwealth's use of APD evidence here reveals why it did not amount to sufficient proof. To demonstrate that Souza currently suffers from APD, the Commonwealth's experts relied principally on his obstreperous behavior while confined at the treatment center.  Granted, Souza's comportment during his decade of confinement was hardly exemplary.  However, his documented violations of Massachusetts Treatment Center (treatment center) rules averaged only about two per year, and they mainly involved minor infractions such as trying to get medication at an incorrect time, "[f]ailure to stand for a [head] count, sleeping during a count, [and] things of that nature."  Notably, none of Souza's violations of treatment center rules involved any inappropriate sexual behavior.  Compare Commonwealth v. Husband, 82 Mass. App. Ct. at 5 ("Commonwealth experts testified that [sex offender's] personality disorder resulted in his inability to control his sexual impulses as evidenced by both the governing offenses and

his extensive record of sexually aggressive and abusive conduct while incarcerated").

Moreover, as the trial judge cogently observed, even though proof that someone has APD may be sufficient to satisfy the statute's definitional requirements, this does not relieve the Commonwealth from having to prove that Souza currently has sexual compulsions on which his APD will induce him to act. Absent such proof, Souza cannot constitutionally be preventively detained. Passing over the question of whether there was adequate proof that Souza ever suffered from sexual compulsions that likely would cause him to reoffend,[7] evidence that he continued to have such compulsions at age sixty-nine was conspicuously absent. In fact, the Commonwealth did not present any evidence that Souza exhibited sexually inappropriate behavior of any kind since 1990.[8] In addition, the only

---

[7] This is not a case where the historical pattern of sex offenses itself demonstrated that the offender must have suffered from such compulsions.

[8] Obviously, opportunities for sexual misbehavior may be more limited for someone who is confined, but they are hardly absent. Compare Commonwealth v. Husband, 82 Mass. App. Ct. at 2 (noting a sex offender's disciplinary record while incarcerated, in which "[h]is reported conduct toward prison female medical personnel included sexual epithets, insults, taunts, threats, exposure, and masturbation"). Moreover, as the evidence in this case revealed, sex offenders who target children sometimes exhibit sexually inappropriate behavior in confinement, such as hoarding pictures of children. There was even testimony about a pornography ring operating inside the treatment center; Souza was not implicated in any such activity.

objective test administered to Souza by the treatment center showed that he exhibited no clinically significant arousal to any of the sexual stimuli presented to him.[9]

Nor do I believe the other factors the Commonwealth's experts relied upon supplied the missing proof. Both of the Commonwealth's experts emphasized Souza's refusal to admit his past sexual abuse of the two victims, something they asserted was a prerequisite to his being able to avoid reoffending. For example, in Tomich's view, Souza could not progress to the point that he safely could be released until he "squarely face[d] the reasons for his incarceration and for his civil commitment." Even to the extent Souza denied his offenses,[10] the import of

---

[9] Kelso discounted the results of the penile plethysmograph (PPG) test, even while acknowledging that respected empirical researchers had concluded that the best predictor of recidivism was sexual deviancy, as measured by PPG tests or other means. This is not to say that the reliability of PPGs has been established, and one of Souza's own experts stated that he does not put much stock in such tests. However, the fact remains that the one test that the treatment center itself administered to Souza to measure his response to sexual stimuli provided no evidence to support the Commonwealth's case and, if anything, undercut that case.

[10] The uncontested facts belie any suggestion that Souza has accepted no responsibility for his two sex offenses. Indeed, Souza pleaded guilty to both offenses. In addition, even though his postplea accounts of the 1971 offense have varied somewhat, he has regularly admitted that he had intercourse with the 1971 victim while she was underage and that what he did was wrong. Granted, although Souza pleaded guilty to having indecently touched the 1990 victim, he denied sexually assaulting the boy in his postplea accounts. Souza was also indicted of rape of a child, something he consistently denied. The Commonwealth nol

that denial is, at a minimum, subject to significant doubt.  The Commonwealth's lead expert acknowledged that a pre-eminent empirical study found no correlation between denial and recidivism.  In the face of that study, the Commonwealth offered no empirical studies or evidence of a medical consensus to support its contrary position that denial is somehow a predictor of future offending.[11]

More generally, the Commonwealth's experts insisted that the risks Souza presented to the community at large should be considered unacceptable until he has completed a treatment program at the treatment center.  That view presupposes both that Souza presents unacceptable risks without treatment and that treatment would address such risks.  Neither proposition is self-evident, and one searches in vain for evidence to support

_____

prossed the rape charge (after Souza's admitted that he touched the boy's penis), and it made no independent effort to substantiate that Souza had committed a rape.  Nevertheless, the majority goes out of its way to highlight salacious details underlying the rape allegations even though the Commonwealth itself appropriately avoided the issue.

[11] I fully appreciate that the Legislature has made the opinions of QEs admissible in SDP trials regardless of whether they have been demonstrated to be reliable, and that this situation-specific modification of the rules of evidence has been upheld.  See Commonwealth v. Markvart, 437 Mass. 331, 339 (2002), citing G. L. c. 123A, § 14(c).  However, especially in light of the overlaying constitutional concerns that are implicated, I do not interpret such precedent as barring any judicial inquiry into whether the opinion of the QE enjoys a demonstrated medical foundation.  That inquiry need not embroil a trial judge in making credibility determinations or "weighing" the evidence.

them here.[12]  In fact, the evidence that was presented tended to undercut the Commonwealth's case.  For example, the treatment center itself ruled out one form of treatment -- behavioral conditioning -- given Souza's nonresponsiveness to sexual stimuli as measured by the PPG test.[13]  The experts' reliance on Souza's failure to complete a treatment program is particularly problematic in light of the undisputed fact that Souza has profound cognitive limitations that, at a minimum, make it difficult for him to complete a classroom course of study.[14]  Cf.

---

[12] The experts' stance on the need for treatment is better understood as a policy position than as evidentiary proof.  That the experts would adopt such a position is consistent with the institutional roles that each played.  Kelso was an employee of the private contractor that provided sex offender services at the treatment center, and Tomich was the director of forensic psychological services at the Department of Correction.

[13] Kelso, the Commonwealth's lead expert, acknowledged that a preeminent empirical study demonstrated only a minor correlation between treatment and recidivism.  Again, the existence of that study did not preclude the Commonwealth from proving that Souza's failure to complete a treatment program mattered, but, again, the Commonwealth offered no empirical studies or evidence of medical consensus to substantiate its position.

[14] It is undisputed that Souza is of borderline intelligence, with an IQ measured between sixty-eight and seventy-one.  Treatment center records show that he is able to read at a third-grade level.  Kelso acknowledged that Souza's cognitive limitations presented potential obstacles to his succeeding in the treatment classes made available to him, and Tomich acknowledged that Souza's cognitive limitations meant that "it may take him longer to benefit from treatment."  There was evidence that programs tailored for people with Souza's limitations were "sometimes offered" at the treatment center, that at least one treatment component was modified to address

Kansas v. Hendricks, 521 U.S. at 389-393 (Breyer, J., dissenting) (Sex offenders cannot be civilly confined without being offered adequate treatment).  In addition, it is undisputed that Souza's efforts to pursue sex offender treatment were interrupted when his participation was suspended as a disciplinary sanction for his not complying with treatment center rules.  In other words, for acting out while he was involuntarily confined based on his allegedly not having received adequate treatment, the Commonwealth withheld the treatment that it considered necessary to allow his release.

Finally, I address the Commonwealth's one attempt to take on Souza's advanced age with empirically-based proof.  Kelso relied in part on the "Static-99R" model, a widely-used tool that attempts to predict the degree of likelihood that a convicted sex offender will reoffend.  As Kelso explained, the Static-99R model was specifically formulated to address the reduction in risk correlated with the aging process.  However, a close examination of Kelso's use of the Static-99R model shows that it provides negligible support for his position that Souza remains an SDP.  Kelso accepted that Souza had been married, and he acknowledged that his long-term relationship with his wife may well have lasted more than two years.  Kelso also

those limitations, and that he was able to pass that one (and a "few" classes overall).

acknowledged that if this were so, then by Kelso's own calculations, Souza would score only a five on the Static-99R test, which would place him outside the category of offenders considered to be at a high risk to reoffend.[15] None of this is to say that a sex offender may be found to be an SDP only if he scores in the high risk category using the Static-99R model. My point is merely that Kelso's own reliance on empirically-based modeling undercut his claim that Souza was currently at a high risk to reoffend.

In sum, in my view, the trial judge applied appropriate scrutiny to the expert opinions that the Commonwealth offered and -- finding them lacking in adequate foundational support -- properly terminated the proceeding and ordered Souza's release. In the face of the Commonwealth's efforts to portray its case as adorned in the raiments of medical expertise, the trial judge dared to point out that "the emperor has no clothes."[16]

---

[15] Kelso was able to score Souza that high only by crediting him with six 1971 sex crimes, even though five of the six New York charges were dropped, and there was no independent evidence presented in this trial that Souza had committed those crimes.

[16] Because I consider a retrial unwarranted, I would not reach the Commonwealth's claim that the jury instructions were erroneous. I state no view on the merits of that issue except to note that while I agree with the majority that a narrow reading of Johnstone, Petitioner, 453 Mass. 544, 553 (2009), does not compel the instruction that the trial judge gave, that instruction does find some support in the reasoning on which Johnstone is based. Clarification from the Supreme Judicial Court on this point of law would be beneficial.